**No. 15-60205**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

GOOGLE, INC.,

*Plaintiff-Appellee*,

v.

JAMES M. HOOD, III,
Attorney General of the State of Mississippi, in his official capacity,

*Defendant-Appellant*.

_____

On Appeal From the United States District Court
for the Southern District of Mississippi,
No. 3:14-cv-00981

_____

## BRIEF OF *AMICI CURIAE* DIGITAL CITIZENS ALLIANCE,
## THE TAYLOR HOOTON FOUNDATION, AND RYAN UNITED
## IN SUPPORT OF APPELLANT

_____

PAUL D. CLEMENT
 *Counsel of Record*
VIET D. DINH
JEFFREY M. HARRIS
C. HARKER RHODES IV
BANCROFT PLLC
500 New Jersey Avenue NW
7th Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Amici Curiae*

June 29, 2015

## SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to this Court's Rule 29.2, the undersigned counsel of record for *amici curiae* certifies that the following additional persons and entities have an interest in the outcome of this case:

1. Digital Citizens Alliance, *amicus curiae*. Digital Citizens Alliance is a nonprofit corporation recognized as tax-exempt under Internal Revenue Code §501(c)(6).  It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

2. The Taylor Hooton Foundation, *amicus curiae*. The Taylor Hooton Foundation is a nonprofit organization recognized as tax-exempt under Internal Revenue Code §501(c)(3). It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

3. Ryan United, *amicus curiae*. Ryan United is a nonprofit organization recognized as tax-exempt under Internal Revenue Code §501(c)(3).  It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

4. Clement, Paul D., attorney for *amici curiae*.

5. Dinh, Viet D., attorney for *amici curiae*.

6. Harris, Jeffrey M., attorney for *amici curiae*.

7. Rhodes, C. Harker, attorney for *amici curiae*.

s/Paul D. Clement
Paul D. Clement

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................... iii

INTEREST OF *AMICI CURIAE* ............................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT....................................... 2

FACTUAL BACKGROUND ..................................................................... 6

ARGUMENT ...................................................................................... 9

I.     The District Court Erred In Determining That Google Was Likely
       To Succeed On Its Claims................................................................ 9

       A.    Google Is Not Likely to Succeed on Its Claim That the CDA
             Prohibits the Attorney General's Investigation ...................................11

       B.    Google Is Not Likely to Succeed on Its First Amendment
             Claim ................................................................................... 15

       C.    Google Is Not Likely to Succeed on Its Fourth Amendment
             and Preemption Claims ....................................................... 19

II.    The District Court Erred In Holding That The Balance Of Equities
       And The Public Interest Favored An Injunction........................................... 20

       A.    Google Will Not Suffer Irreparable Injury From the Attorney
             General's Investigation......................................................... 22

       B.    The Balance of Equities and the Public Interest Weigh
             Heavily Against the Injunction Entered Below.................................. 24

CONCLUSION .................................................................................... 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*A&M Records v. Napster*,
  239 F.3d 1004 (9th Cir. 2001) ............................................................. 17

*Am. Radio Ass'n v. Mobile S.S. Ass'n*,
  483 F.2d 1 (5th Cir. 1973) .................................................................... 23

*Bond Pharmacy v. AnazaoHealth*,
  815 F. Supp. 2d 966 (S.D. Miss. 2011) ................................................. 24

*Bose Corp. v. Consumers Union*,
  466 U.S. 485 (1984) .............................................................................. 16

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) .............................................................................. 17

*Canal Auth. of Fla. v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) .......................................................... 21, 23

*Colson v. Grohman*,
  174 F.3d 498 (5th Cir. 1999) ................................................................ 18

*Comm. in Solidarity with El Salvador v. Sessions*,
  705 F. Supp. 25 (D.D.C. 1989) ............................................................ 25

*Demetriades v. Yelp*,
  175 Cal. Rptr. 3d 131 (Cal. App. 2014) ............................................... 14

*DeSpain v. Johnston*,
  731 F.2d 1171 (5th Cir. 1984) .............................................................. 25

*Doe v. MySpace*,
  528 F.3d 413 (5th Cir. 2008) ................................................................ 11

*Fair Hous. Council of San Fernando Valley
  v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ......................................................... 13, 14

*FTC v. Accusearch Inc.*,
  570 F.3d 1187 (10th Cir. 2009) ....................................................... 13, 14

*Gilbreath v. Guadalupe Hosp. Found.*,
  5 F.3d 785 (5th Cir. 1993) .................................................................................... 20

*Hare v. Richie*,
  No. ELH-11-3488, 2012 WL 3773116 (D. Md. Aug. 29, 2012) ....................... 13

*Harper & Row v. Nation Enters.*,
  471 U.S. 539 (1985) ............................................................................................ 17

*Hartman v. Moore*,
  547 U.S. 250 (2006) ............................................................................................ 18

*Holland Am. Ins. v. Roy*,
  777 F.2d 992 (5th Cir. 1985) .............................................................................. 23

*Keenan v. Tejeda*,
  290 F.3d 252 (5th Cir. 2002) .............................................................................. 19

*Morgan v. Fletcher*,
  518 F.2d 236 (5th Cir. 1975) .............................................................................. 24

*New Motor Vehicle Bd. v. Orrin Fox Co.*,
  434 U.S. 1345 (1977) .......................................................................................... 25

*New York v. Ferber*,
  458 U.S. 747 (1982) ............................................................................................ 17

*O'Keefe v. Chisholm*,
  769 F.3d 936 (7th Cir. 2014) .............................................................................. 25

*Parks v. Dunlop*,
  517 F.2d 785 (5th Cir. 1975) .............................................................................. 22

*Pittsburgh Press v. Pittsburgh Comm'n on Human Relations*,
  413 U.S. 376 (1973) ............................................................................................ 17

*Planned Parenthood v. Abbott*,
  734 F.3d 406 (5th Cir. 2013) ............................................................... 6, 24, 29, 30

*Rehberg v. Paulk*,
  611 F.3d 828 (11th Cir. 2010) ............................................................................ 18

iv

*Sampson v. Murray*,
  415 U.S. 61 (1974)............................................................................. 24

*Smith v. Plati*,
  258 F.3d 1167 (10th Cir. 2001)......................................................... 19

*Tex. Ass'n of Bus. v. Earle*,
  388 F.3d 515 (5th Cir. 2004)............................................................. 19

*Trainor v. Hernandez*,
  431 U.S. 434 (1977)........................................................................... 25

*True the Vote v. Hosemann*,
  43 F. Supp. 3d 693 (S.D. Miss. 2014)............................................... 24

*Veasey v. Perry*,
  769 F.3d 890 (5th Cir. 2014)............................................................. 30

*Voting for Am. v. Andrade*,
  488 F. App'x 890 (5th Cir. 2012)...................................................... 30

*White v. Carlucci*,
  862 F.2d 1209 (5th Cir. 1989)........................................................... 22

*Winter v. NRDC*,
  555 U.S. 7 (2008)........................................................................ 21, 30

*Younger v. Harris*,
  401 U.S. 37 (1971)........................................................... 3, 19, 21, 26

**Statute**

47 U.S.C. §230.........................................................................11, 12, 14

**Other Authorities**

Peter Cohan, *Harvard Professor Sees Google's Illegal Revenue Over $1 Billion*,
  Forbes (Nov. 8, 2013), http://onforb.es/1TLTsRB............................... 8

Digital Citizens Alliance,
  *Better at Any Cost: The Dangerous Intersection of Young People, Steroids, and
  the Internet* (Oct. 8, 2013), https://perma.cc/9twp-tpev...................... 8

Digital Citizens Alliance,
*Digital Weeds: How Google Continues to Allow Bad Actors to Flourish on YouTube* (Mar. 10, 2014), http://perma.cc/z9wl-xvxu ................................... 8, 27

Digital Citizens Alliance,
*Google & YouTube and Evil Doers: Too Close for Comfort* (June 10, 2013), http://perma.cc/39ta-cstk................................................................................... 8, 27

Google Transparency Report, *Requests for User Information, United States*, http://bit.ly/1eGiEZP (last visited June 20, 2015) ............................................ 13

*How to Buy Cigarettes When Underage*,
YouTube, http://bit.ly/1BMQJBJ (last visited June 24, 2015) .......................... 28

*How to Create Fake ID Using Photoshop*,
YouTube, http://bit.ly/1LCf8d3 (last visited June 24, 2015)............................. 28

Drew Kerley, *Group Probes Ease and Danger of Buying Steroids Online*, ABC News (Oct. 3, 2013), http://perma.cc/c6wx-rpp5..................................... 26

Timothy B. Lee, *Feds Say Senior Google Execs Knew About Illicit Pharma Ads*, arstechnica (Jan. 25, 2012), http://perma.cc/ekx8-wzsm ..................................... 9

Jayne O'Donnell, *Google Cuts Illegal Drug Site Search Ads and Videos*, USA Today (June 10, 2013), http://perma.cc/4wcp-y73j ................................... 26

Press Release, U.S. Department of Justice, *Google Forfeits $500 Million Generated by Online Ads & Prescription Drug Sales by Canadian Online Pharmacies* (Aug. 24, 2011), http://1.usa.gov/1FzhqED .......................... 7, 9, 10

## INTEREST OF *AMICI CURIAE* [1]

Digital Citizens Alliance, a nonprofit organization, is a coalition of consumers, businesses, and Internet experts.  It works to make the Internet a safer place by engaging key Internet stakeholders:  individuals, Internet companies, and civic leaders.  Digital Citizens Alliance has an important interest in this case because it is focused on educating the public and policymakers on Internet threats.

The Taylor Hooton Foundation is widely recognized as a leading national organization focused on preventing appearance- and performance-enhancing drug (APED) abuse by the youth of America.  The foundation was formed in memory of Taylor E. Hooton, a 17-year-old high school athlete from Plano, Texas.  Taylor took his own life on July 15, 2003, after using anabolic steroids.  Taylor's parents, family, and friends founded the organization after learning of the growing number of middle school, high school, and college students illegally using and abusing anabolic steroids, human growth hormone (HGH), unregulated dietary supplements, and other APEDs.  It has a significant interest in this case given its mission to stop the abuse of anabolic steroids, HGH, unregulated dietary supplements, and APEDs.

Ryan United was formed in memory of Ryan VanLuchene, who at 8 years old was kidnapped, sexually assaulted, and murdered by a repeat sex offender.  Ryan

---

[1] This brief was not written in whole or in part by counsel for any party, and no person or entity other than *amici*, their members, and their counsel has made a monetary contribution for the preparation and submission of this brief.

United works with key stakeholders across the country to promote better, more sensible laws aimed at making communities safer.  It has an important interest in this case because a key component of its mission is promoting online safety for children and their families.

In sum, *amici* have a strong interest in ensuring that law enforcement officials have the tools they need to prevent child predation, illegal sales of steroids and other drugs, and countless other crimes that may be committed using the Internet.  *Amici* have previously cautioned that Google's platforms and services can be used for illegal purposes.  *See infra* note 5.  What remains unknown—and what Attorney General Hood's investigation seeks to uncover—is Google's relationship to these activities.  *Amici* strongly believe that nothing in the U.S. Constitution or federal law prevents that investigation from proceeding.

## INTRODUCTION AND SUMMARY OF ARGUMENT

At Google's behest, the district court entered a sweeping and unprecedented preliminary injunction prohibiting the Attorney General of Mississippi from exercising his full authority to investigate whether Google has violated state law.  That injunction was a severe abuse of discretion.  It violates basic principles of federalism and comity by using the federal judicial power to strangle a nascent state investigation.  It radically over-reads the protections of the Communications Decency Act ("CDA") and the First Amendment, turning them into an impenetrable

shield that can prevent state law enforcement officials from even *investigating* suspected wrongdoing. And most strikingly, it simply ignores the weighty public interest in allowing the Attorney General to seek out and prevent criminal activity. This unprecedented and unwarranted restraint on state law enforcement authority should be quickly reversed.

To the extent Google is dissatisfied with the Attorney General's investigation into its conduct, it has numerous options at its disposal. It can seek to narrow or quash the subpoena; it can meet with the Attorney General to attempt to address any concerns about illegal activity; or it can refuse to cooperate, and then defend itself in court if and when it faces an enforcement action. Those are the options that regulated parties have had for as long as there have been Attorney General investigations. What is not an option, however, is to have a federal court preemptively and categorically shut down the Attorney General's investigation into its suspected wrongdoing. Indeed, courts have held "time and time again" that "the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Younger v. Harris*, 401 U.S. 37, 45 (1971). "Our Federalism" demands nothing less. Refraining from enjoining state criminal investigations reflects a "proper respect for state functions," and recognizes that "the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id.* at 44. That

includes leaving state law enforcement free to investigate suspected violations of state law. There is no exception to that bedrock principle for suspected crimes committed on the Internet.

In ordering the Attorney General to abandon his subpoena and refrain from investigating Google, the district court not only intruded into a core area of state sovereignty—it did so without any remotely sufficient basis. Neither the CDA nor the First Amendment limits the ability of law enforcement to investigate leads about third-party wrongdoing by seeking critical evidence from online service providers. Even Google does not dispute that the First Amendment and the CDA would pose no bar to a subpoena issued in connection with a state criminal investigation into a homicide, kidnapping, or robbery. Yet under the district court's expansive and categorical view of the CDA and the First Amendment, a service provider like Google could cooperate with or block such legitimate law enforcement investigations at its election. Moreover, one of the key purposes of the Attorney General's investigation is to determine whether Google *itself* has facilitated or profited from the distribution of illegal content, or has made misrepresentations about its actions regarding such content. The Attorney General cannot be required to take Google's protestations that it is merely a conduit and voluntarily self-regulates at face value. That is what the investigation is designed to determine.

4

In light of *Younger*, as well as the other legal arguments advanced by the Attorney General, this injunction should have been a non-starter and the district court was plainly wrong to find that Google has a likelihood of success on the merits. Its order should be reversed for that reason alone. But even if Google had shown a likelihood of success on the merits, the preliminary injunction still could not survive, as the district court undertook no serious analysis of the balance of the equities and the public interest, both of which weigh overwhelmingly against the extraordinary relief granted below.

As *amici* have previously documented in a number of reports, there are reasons to suspect that Google's services are being used to facilitate the distribution of unlawful content and products, and that Google may be profiting from this illegal activity. For example, Google's YouTube service has been used by those seeking to sell steroids and other illegal drugs online (sometimes in videos accompanied by Google-placed advertisements). Investigations like the one Google seeks to halt in its tracks are designed to determine whether these suspicions regarding Google's involvement in various illegal activities are well-founded.

Thus, on one side of the ledger, the top law enforcement official of the State of Mississippi simply seeks *information* about whether Google's activities are threatening the safety and well-being of consumers. On the other side, any harm to Google from the investigation is *de minimis*, especially given the many traditional

5

and federalism-respecting options at Google's disposal if it wishes to challenge the
scope of the investigation. The balance of equities under these circumstances is not
even close.

Finally, the district court compounded its error by ignoring the substantial
public interest in allowing the Attorney General to pursue an investigation into
suspected illegal activity. Such an investigation unquestionably seeks to protect the
public as a whole, which must weigh heavily in the decision of whether to grant
injunctive relief. *See Planned Parenthood v. Abbott*, 734 F.3d 406, 419 (5th Cir.
2013) (recognizing "the public interest in the enforcement of [the] laws"). The
district court, however, refused to even consider that aspect of the public interest,
instead espousing a *per se* rule that "injunctions protecting First Amendment
freedoms are always in the public interest." Op. 24. That holding is demonstrably
wrong under a long line of Supreme Court precedent and cannot support the
sweeping injunction entered below.

## FACTUAL BACKGROUND

As one might expect given Google's central role as a profoundly profitable
vehicle for numerous activities both licit and illicit, Google has not escaped the
attention of federal and state prosecutors. In 2011, for example, Google agreed to
pay $500 million to avoid prosecution after federal authorities and the Rhode Island
Attorney General alleged that Google was aiding overseas pharmacies in illegally

marketing prescription drugs in the United States.[2]  James Cole, the United States Deputy Attorney General at that time, stated that "[t]he Department of Justice will continue to hold accountable companies who in their bid for profits violate federal law and put at risk the health and safety of American consumers," and that the settlement ensured Google would "reform its improper advertising practices with regard to these pharmacies while paying one of the largest financial forfeiture penalties in history."[3]

While Google's advertising practices unquestionably implicate First Amendment considerations, that did not preclude federal and state authorities from investigating online drug sales by entities that used Google's services, nor did it stop Google from reaching a settlement.  The federal investigation also raised additional questions, such as whether Google helped others circumvent the law.  These are precisely the kind of questions that Mississippi Attorney General Hood seeks to investigate here.

Although Google has already paid $500 million to resolve allegations that it facilitated the illegal marketing of prescription drugs, there are reasons to believe that its services are still being used for unlawful activities that pose a risk to both

---

[2] Press Release, U.S. Department of Justice, *Google Forfeits $500 Million Generated by Online Ads & Prescription Drug Sales by Canadian Online Pharmacies* (Aug. 24, 2011) ("DOJ Press Release"), http://1.usa.gov/1FzhqED.

[3] *Id.*

children and adults.  In particular, online drug sellers continue to use YouTube videos to market their illegal products in the United States.  *Amicus* Digital Citizens Alliance, for example, has found significant numbers of search results on YouTube by searching for "buy drugs without a prescription," and similar phrases referring to specific drugs and steroids.[4]  Some of those videos are accompanied by Google-placed advertisements, in many cases related to the content of the illegal activity, that raise questions about whether Google is facilitating or profiting from these illegal activities.  *See* Part II.B, *infra*.

While there may be explanations and defenses for some of this conduct, at this juncture there is manifestly a legitimate basis for further investigation.  Indeed, Harvard Professor Ben Edelman estimated in 2013 that Google's profits from illegal activities may exceed $1 billion annually.[5]  All of these activities and profits raise questions that merit investigation, and it is eminently reasonable for the Mississippi

---

[4] Digital Citizens Alliance, *Google & YouTube and Evil Doers: Too Close for Comfort* ("*Too Close for Comfort*"), at 6-9 (June 10, 2013), http://perma.cc/39ta-cstk; *see also* Digital Citizens Alliance, *Digital Weeds: How Google Continues to Allow Bad Actors to Flourish on YouTube* ("*Digital Weeds*"), at 3-5 (Mar. 10, 2014), http://perma.cc/z9wl-xvxu; Digital Citizens Alliance, *Better at Any Cost: The Dangerous Intersection of Young People, Steroids, and the Internet*, at 7-14 (Oct. 8, 2013), https://perma.cc/9twp-tpev.

[5] Peter Cohan, *Harvard Professor Sees Google's Illegal Revenue Over $1 Billion*, Forbes (Nov. 8, 2013), http://onforb.es/1TLTsRB.

Attorney General to seek further information to determine the nature and extent of Google's involvement with these illegal activities.

## ARGUMENT

### I.    The District Court Erred In Determining That Google Was Likely To Succeed On Its Claims.

The district court seriously erred by concluding that federal law likely gives Google the right to shut down the pending investigation by the Mississippi Attorney General. That investigation is focused on whether Google assisted (and in certain cases continues to assist) those committing serious violations of Mississippi law and endangering or defrauding the public—for example, illegal narcotics and steroids dealers who use Google's platforms to promote and sell their services. The Attorney General also seeks information about whether Google has misrepresented its own conduct in addressing illegal activity.

There are unquestionably ample grounds to proceed with this investigation. As noted above, Google has previously paid a $500 million fine to the Department of Justice and the State of Rhode Island to avoid prosecution for facilitating illegal pharmaceutical sales. According to the Department of Justice, this wrongdoing occurred "with Google's knowledge and assistance."[6] Pursuant to the terms of the

---

[6] DOJ Press Release, *supra* note 2; *see also* Timothy B. Lee, *Feds Say Senior Google Execs Knew About Illicit Pharma Ads*, arstechnica (Jan. 25, 2012), http://perma.cc/ekx8-wzsm.

nonprosecution agreement, Google acknowledged that it "improperly assisted" the foreign marketers of illegal prescription drugs.[7]

The district court ignored this stark evidence of Google's past wrongdoing, choosing instead to take Google's protestations of innocence at face value. It claimed that Google was seeking relief "relating only to conduct that is seemingly immunized by federal law," because "Google claims that all of the [relevant] third-party content … was created and developed by some other content provider." Op. 17. But that is both circular and wrong:  the whole point of the Attorney General's investigation and subpoena is to determine *whether* Google was just passing along content created by others or was instead facilitating (and profiting from) illegal activities.  Indeed, the district court readily acknowledged that much of the "third-party content [that Google] publishes raises legitimate concerns," and even Google itself "does not argue that the Attorney General's concerns are completely unfounded." *Id.* at 17-18.  Nothing in the Constitution or any federal statute exempts Google from a legitimate investigation into those concerns, or immunizes it from liability if it participated in unlawful activities.

---

[7] DOJ Press Release, *supra* note 2.

**A.    Google Is Not Likely to Succeed on Its Claim That the CDA Prohibits the Attorney General's Investigation.**

Section 230 of the CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. §230(c)(1).  As this Court has explained, Section 230 bars claims against web-based service providers "stemming from their publication of information created by third parties."  *Doe v. MySpace*, 528 F.3d 413, 418 (5th Cir. 2008).  The district court held that Google was likely to succeed under this provision because Google alleged it did not create any of the "specific category of third-party content" at issue.  Op. 18.  Based on those representations, the district court concluded that Google was entitled to "maintain the status quo" until the court "determines the extent of its responsibility" with respect to that content.  Op. 18.

That analysis, however, puts the cart before the horse and confuses the role of the federal district court and the State Attorney General.  The latter is empowered to investigate potential criminal conduct and to determine whether Google is a mere conduit.  The former is duty bound to avoid interference with such ongoing state investigations.  Nothing in the CDA purports to create an exception to *Younger* or to prohibit a state attorney general from gathering facts needed to determine *whether* Section 230 applies.

11

Indeed, contrary to Google's suggestion, the CDA makes clear that it does not offer web-based service providers categorical immunity for their businesses, let alone suspend *Younger* principles in ways that would preclude state investigations into whether any non-immune conduct occurred.   In fact, Section 230(e)(3) expressly preserves the ability of state officials to bring claims under state law:

> Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section.  No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

47 U.S.C. §230(e)(3). That section expressly protects state authority to "enforce any State law that is consistent with [the CDA]," as the consumer protection laws of Mississippi undoubtedly are.  *Id.*  To the extent the CDA does preempt state action, it does so only by ensuring that "[n]o *cause of action may be brought* and no *liability may be imposed*" inconsistent with the CDA.  *Id.* (emphasis added).  An immunity from investigation would be a radical departure from the normal order and raise serious federalism concerns.  Nothing in the CDA suggests that Congress wanted to court those constitutional difficulties or prohibit state authorities from even *investigating* possible wrongdoing.

Google itself emphasizes on its website that, in the last six months of 2014, it complied with more than 7,500 requests for information in connection with criminal

12

investigations, including more than 4,000 subpoenas.[8]  But under the district court's sweeping theory of Section 230, that is all a matter of grace on the part of Google unless those information requests pertained solely to content actually *created* by the company.   Needless to say, that rule would severely burden law enforcement officials' ability to investigate criminal activity and protect the public.

The district court cited no other case adopting its interpretation of Section 230—because no other court has ever taken that sweeping view of the statute.  To the contrary, it is well-established that a web-based service provider cannot claim immunity under the CDA if it actively participates in or facilitates criminal acts. *See, e.g.*, *Fair Hous. Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1171-72 (9th Cir. 2008) (website operator not entitled to immunity with respect to allegedly unlawful content it required users to submit and with respect to the search engine that was built on that content); *FTC v. Accusearch*, 570 F.3d 1187, 1200-01 (10th Cir. 2009) (defendant "not entitled to immunity under the CDA" because "it contributed mightily to the unlawful conduct"); *Hare v. Richie*, No. ELH-11-3488, 2012 WL 3773116 (D. Md. Aug. 29, 2012) (denying motion to dismiss and allowing discovery to determine whether CDA immunity applied).  And it is equally well established that where the actionable content is generated by the Internet service

---

[8] *See* Google Transparency Report, *Requests for User Information, United States*, http://bit.ly/1eGiEZP (last visited June 20, 2015).

provider itself, rather than by third parties or in response to content created by third parties, the service provider is not immune under the CDA. *See* 47 U.S.C. §230(c)(1); *Demetriades v. Yelp*, 175 Cal. Rptr. 3d 131, 145 (Cal. App. 2014) ("Nowhere does plaintiff seek to enjoin or hold Yelp liable for the statements of third parties (i.e., reviewers) on its website. Rather, plaintiff seeks to hold Yelp liable for its own statements regarding the accuracy of its filter.").

As the district court conceded, and as Google itself acknowledges, the Mississippi Attorney General has "legitimate concerns" over dangerous and potentially illegal content that regularly appears on Google. Op. 17-18. The Attorney General's investigation is designed to determine whether Google has aided or profited from that content. If it has, then the CDA simply does not immunize Google's acts. *See Roommates.com*, 521 F.3d 1157; *Accusearch*, 570 F.3d at 1200-01. The district court's decision to shut down the investigation thus leaves law enforcement officials in an impossible position: the district court relied on the CDA to prohibit the Attorney General from uncovering the very facts needed to determine whether the CDA applies in the first place. Without those facts, neither the Attorney General nor the district court will ever be able to "determine[] the extent of [Google's] responsibility under the law." Op. 18.

The Attorney General's investigation also raises important questions about whether Google lives up to its representations about the standards it applies for use

14

of its services. Just as in *Demetriades*, those representations are at the very least subject to investigation by state law enforcement officials. But once again, the district court's approach was exactly backwards: instead of deferring to the Attorney General's authority to investigate Google's practices, it deferred to Google's own representation that it "has taken appropriate measures to address [any] problematic material" posted on its site. Op. 17. The district court simply accepted at face value Google's statement that it takes "great care" to voluntarily "comply with and go well beyond Google's legal obligations." Op. 17-18. The CDA, however, does not require state law enforcement authorities to blindly believe whatever Internet service providers tell them. Nor does it empower federal district court judges to oversee the efforts of state law enforcement to determine whether the protestations of innocence are supported by the evidence. Simply put, the CDA was not a purported partial repeal of *Younger* or "Our Federalism."

### B.    Google Is Not Likely to Succeed on Its First Amendment Claim.

The district court also wrongly held that the First Amendment likely prohibits the Attorney General from continuing his investigation. That conclusion severely over-reads the protections of the First Amendment, and threatens to impair a broad array of legitimate law enforcement activities.

The Supreme Court has emphasized the need "to make an independent examination of the entire record" in cases involving First Amendment issues. *Bose*

*Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984). The injunction entered below, however, would prevent Mississippi from compiling the factual record needed to evaluate Google's First Amendment claim. After all, Google does not contend that the First Amendment provides *unlimited* protection for its search engine and YouTube platform for viewing third-party news and information. For example, Google has acknowledged that it will remove links to a website from its search results upon receipt of a valid court order. And as noted above, Google complies with thousands of subpoenas and search warrants each year. But neither Google nor anyone else has ever before suggested that these "threats of legal action" or "burdensome subpoena[s] … would likely produce a chilling effect on Google's protected speech, thereby violating Google's First Amendment rights." Op. 19. Yet under Google's view of the First Amendment, any cooperation with law enforcement would rest solely within the discretion of the internet provider. Needless to say, nothing in the First Amendment insulates a company from complying with a legitimate government investigation into potential illegal activities.

The district court also relied on "developing jurisprudence" from the Southern District of New York to hold that the First Amendment protects Google's "editorial judgment as to its search results." Op. 18-19. But, even assuming those cases were correctly decided, they do not remotely suggest that the First Amendment protects an Internet provider that has facilitated or profited from illegal activities. Indeed,

even a *newspaper* lacks a First Amendment defense with respect to "Men Only" help-wanted ads that violate employment laws barring sex discrimination. *See Pittsburgh Press v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973) (upholding injunction against a newspaper's furtherance of illegal sex discrimination by placing of job advertisements in gender-designated columns). And no company has a First Amendment right to distribute child pornography or other kinds of unprotected speech, *New York v. Ferber*, 458 U.S. 747, 762-64 (1982), to publish stolen copyright material, *see, e.g.*, *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 548-49 (1985), or to knowingly facilitate theft of intellectual property, *see, e.g.*, *A&M Records v. Napster*, 239 F.3d 1004, 1028 (9th Cir. 2001).

Nor should Google be able to use the mere *possibility* of an eventual First Amendment defense (based on a fully-developed factual record) to either force the Attorney General to prematurely disclose his investigatory theories or to preemptively shut down the investigation altogether. *Cf. Branzburg v. Hayes*, 408 U.S. 665, 682 (1972) (reporters must "respond to grand jury subpoenas as other citizens do"). As with Section 230 of the CDA, the district court's holding on the First Amendment ignores the proper division of authority between state law enforcement and federal courts and simply begs the relevant question. The First Amendment plainly does not authorize Google to shut down an investigation that is

17

itself designed to determine whether Google's activities are protected by the First Amendment.

Google cannot change that result merely by claiming that the investigation constituted "retaliation" for protected speech. *See* Op. 19. This Court "unequivocally hold[s] that retaliatory criticisms, investigations, and false accusations that do not lead to some more tangible adverse action" are not actionable under the First Amendment. *Colson v. Grohman*, 174 F.3d 498, 511, 513 (5th Cir. 1999); *see also Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006) ("No one here claims that simply conducting a retaliatory investigation … is a constitutional tort."); *Rehberg v. Paulk*, 611 F.3d 828, 850-51 & n.24 (11th Cir. 2010) ("The Supreme Court has never defined retaliatory investigation … as a constitutional tort, and neither has this Court."); Br. for Appellant at 29 & n.9. And, a fortiori, an allegation that an ongoing state investigation is "retaliatory" is insufficient to empower a federal court to stop it in its tracks. The federalism principles embodied in the *Younger* doctrine are too important to be trumped by the simple expedient of labeling an investigation "retaliatory."

Even if a "retaliatory investigation" claim did exist, Google could not show actionable retaliation here. To establish a First Amendment violation, a plaintiff must show that the alleged retaliation "would chill a person of ordinary firmness from continuing to engage in" protected speech. *Keenan v. Tejeda*, 290 F.3d 252,

18

258 (5th Cir. 2002).  Google does not contend—and the district court did not find—that this investigation has had any meaningful effect on the way in which Google displays search results or exercises editorial judgment.  *See*, *e.g.*, *Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) (retaliation claim failed where government official "did not cause [plaintiff] to suffer an injury that would chill a person of ordinary firmness from continuing to publish an internet site.").  Google's "retaliation" theory thus fares no better than its broader First Amendment claim.

## C.    Google Is Not Likely to Succeed on Its Fourth Amendment and Preemption Claims.

Finally, the district court was equally wrong to find that Google was likely to succeed on its Fourth Amendment and preemption claims.  The district court's sparse legal analysis on the former claim consisted largely of a block quote from Google's brief below, concluding that an unduly burdensome subpoena violates the Fourth Amendment.  Op. 20.  But to the extent Google believes the Attorney General's subpoena is overbroad, its remedy is to challenge enforcement of that subpoena in state court—not to bring a §1983 suit in federal court seeking a federal injunction against the state investigation.  *Cf. Younger*, 401 U.S. at 43-45; *Texas Ass'n of Business v. Earle*, 388 F.3d 515, 521 (5th Cir. 2004) (state procedure provides ample means to challenge subpoena).

As for the district court's preemption analysis, the Attorney General's subpoena is not somehow preempted merely because some of the information it

19

seeks could also be used to show violations of the federal copyright laws or the federal Food, Drug, and Cosmetic Act. Whether a subpoena is appropriate depends on whether the information it seeks is relevant to the underlying investigation, not whether that information could also be used in a *different* investigation. *See, e.g.*, *Gilbreath v. Guadalupe Hosp. Found.*, 5 F.3d 785, 790 (5th Cir. 1993) ("[W]hen reviewing an administrative subpoena … [t]he court's inquiry is limited to two questions: (1) whether the investigation is for a proper purpose and (2) whether the documents the agency seeks are relevant to the investigation."). If Google thinks the subpoena includes some requests that are irrelevant to *any* proper subject of investigation, of course, it is free to challenge those requests if and when the Attorney General seeks enforcement of the subpoena. But Google plainly cannot make an end-run around that process through a sweeping federal injunction against a basic tool of state law enforcement officials.

## II.     The District Court Erred In Holding That The Balance Of Equities And The Public Interest Favored An Injunction.

The district court barely even addressed the other three elements of the preliminary injunction standard, which should have required Google to show that it would "suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *see also Canal Auth. of Fla. v. Callaway*, 489 F.2d

567, 576 (5th Cir. 1974) (plaintiff must "carr[y] his burden of persuasion as to all of the four prerequisites").

Here, even if (contrary to reality) the relief issued were consistent with *Younger* and Google were likely to succeed on the merits, the other three factors would foreclose entry of a preliminary injunction. If Google believes it will suffer some undue inconvenience from complying with the subpoena, there are ample procedural protections built into the subpoena process through which Google could vindicate its asserted rights without the need for premature and preemptive intervention by a federal court. On the other side of the balance, shutting down an investigation designed to determine whether state laws have been violated is an extraordinary step that inevitably risks allowing criminal conduct to go undetected. Google's size and dominant market position only underscore the importance of allowing the Attorney General's investigation to proceed. If the investigation unearths actionable misconduct, then Google's size simply magnifies the scale of the misconduct that could go unpunished. Under these circumstances, and wholly apart from the federalism concerns implicated by a federal court injunction against a state criminal investigation, *see Younger*, 401 U.S. at 44-45, the balance of equities is not

21

even close, and tips strongly against the sweeping preliminary injunction entered by the district court.

## A.    Google Will Not Suffer Irreparable Injury From the Attorney General's Investigation.

The "central purpose" of a preliminary injunction "is to prevent irreparable harm," *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975), and proof of that irreparable injury "must be proven separately and convincingly" from the likelihood of success on the merits. *White v. Carlucci*, 862 F.2d 1209, 1212 (5th Cir. 1989). The plaintiff's burden of proof "is not reduced by either the existence of an extremely strong likelihood of success or the egregiousness of the alleged wrong upon which the underlying claim is based." *Id.*

Ignoring those principles, the district court held that Google had proven irreparable injury merely because it was likely to succeed on its First Amendment claim. Op. 22-23. That argument misses the mark altogether. The Attorney General is not currently restricting Google's speech or forcing it to change its primary conduct in any way. The Attorney General's investigation is still in its infancy; he has asked only for information pursuant to a duly-issued subpoena. That subpoena is not even self-executing, and Google's refusal to answer the subpoena would, at most, result in additional state-court proceedings during which Google could seek to narrow or quash the subpoena on the exact same grounds being advanced in this

case.  The district court was thus flatly wrong to suggest that there was an immediate

"loss of First Amendment freedoms" at issue.  Op. 23.

Google's asserted harm is in fact a paradigmatic example of "reparable harm."

If there is anything to Google's defenses, it can raise them in state court and attempt

to get the subpoena quashed.  *See Holland Am. Ins. v. Roy*, 777 F.2d 992, 997 (5th

Cir. 1985); *Am. Radio Ass'n v. Mobile S.S. Ass'n*, 483 F.2d 1, 5 (5th Cir. 1973).

Moreover, even in the universe of efforts to comply with a subpoena, Google has

identified little basis to claim any harm—let alone irreparable harm—because it

already collects and provides much of the information the Attorney General requests.

Far from infringing Google's right to free speech, the Attorney General has done

nothing but ask Google to provide legally relevant information much like the

information Google already collects and publishes in its existing online

Transparency Report.

At bottom, Google does not want to respond to the subpoena because it does

not want to spend its time and money gathering all the documents relevant to the

Attorney General's investigation.  But that is at best an argument to narrow the

subpoena, not an argument to enjoin the investigation altogether.  The cost of

compliance, even if substantial, does not qualify as irreparable harm.  "[I]t is not so

much the magnitude but the irreparability that counts for purposes of a preliminary

injunction."  *Canal Auth.*, 489 F.2d at 575.  The "time and energy necessarily

23

expended" without an injunction "are not enough" because monetary loss alone does not constitute irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975). But time and energy are the only harms Google can allege with certainty at this early point in the investigation, and any other injuries are merely "speculative." *Bond Pharmacy v. AnazaoHealth*, 815 F. Supp. 2d 966, 975 (S.D. Miss. 2011).

## B.     The Balance of Equities and the Public Interest Weigh Heavily Against the Injunction Entered Below.

If upheld, the injunction entered below would bar the State's top law enforcement official from pursuing an investigation that unquestionably seeks to protect the public. *See Planned Parenthood*, 734 F.3d at 419; *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 741-42 (S.D. Miss. 2014) (state "has a significant interest in enforcing its enacted laws"). The district court seriously erred in finding that the balance of equities and the public interest weighed in favor of that injunction.

As a general matter, the balance of the equities in a suit seeking to enjoin an ongoing criminal investigation tips strongly against granting the injunction. On one side of the balance, there is the possibility that criminal conduct could go undetected and unpunished. Because a state's criminal laws protect against conduct that violates both the public interest and the rights of third parties, few things can tip the balance more strongly against the public interest than the prospect that an injunction would cause criminal conduct to go undetected. *See, e.g.*, *O'Keefe v. Chisholm*, 769 F.3d

24

936, 940 (7th Cir. 2014) (the "policy against federal interference … is especially strong when the state proceedings are criminal in nature"); *Comm. in Solidarity with El Salvador v. Sessions*, 705 F. Supp. 25, 30 (D.D.C. 1989) (alleged constitutional injury was outweighed by the "equally *valid*[] interest in effective police investigation"); *see also New Motor Vehicle Bd. v. Orrin Fox*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., as Circuit Justice) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

On the other side of the balance, the multiple procedural protections any defendant enjoys if a criminal investigation bears fruit amply protect the public interest, by ensuring that the innocent are not wrongly punished and that the investigation is no broader than necessary to achieve law enforcement officials' legitimate goals. *See, e.g.*, *DeSpain v. Johnston*, 731 F.2d 1171, 1176 (5th Cir. 1984) ("the balance tips heavily in favor of the state government and its interest in enforcing its criminal laws" when the target of the prosecution has the opportunity to defend himself in state court); *Trainor v. Hernandez*, 431 U.S. 434, 441-43 (1977) (where plaintiff seeks federal injunction to restrain state proceeding, the analysis should be "broadened to focus on the remedies available in the pending state proceeding," and "[t]he burden of conducting a defense … [is] not sufficient to warrant interference by the federal courts with legitimate state efforts to enforce state

25

laws"). Thus, wholly apart from the distinct federalism concerns implicated by a federal court's injunction of a state investigation, *see Younger*, 401 U.S. at 44-45, the balance of equities tips strongly against judicial intervention to enjoin a nascent criminal investigation.

Here, the Attorney General is justifiably concerned about the use of Google's services to facilitate illegal activity. For example, despite a massive $500 million settlement in 2011, it appears that Google's YouTube service is still being used to facilitate the illegal marketing of drugs, which is obviously harmful to children and adults alike. A June 2013 investigation by *amicus* Digital Citizens Alliance found thousands of YouTube videos marketing the illegal sale of narcotics and steroids.[9] In response to the investigation and report, Google made efforts to take some of the videos down, but many remained available for viewing.

It is troubling that Google allowed, and continues to allow, this content to be posted on its systems. But, even worse, Google may be *profiting* by placing advertising in and around these videos. For example, the following screenshot shows not only a YouTube video offering to illegally sell Percocet, but also adjacent advertising that Google authorized. And the advertisement (for "Spinal Cord

---

[9] Jayne O'Donnell, *Google Cuts Illegal Drug Site Search Ads and Videos*, USA Today (June 10, 2013), http://perma.cc/4wcp-y73j; *see also* Drew Kerley, *Group Probes Ease and Danger of Buying Steroids Online*, ABC News (Oct. 3, 2013), http://perma.cc/c6wx-rpp5.

Stimulation") is closely related to the content of the video, which involves a prescription painkiller.[10]



In another instance, Digital Citizens Alliance found that drug dealers used YouTube to peddle dangerous steroids and human growth hormone (HGH). And, once again, Google was placing advertisements alongside these videos, as shown in the following screenshot:[11]

---

[10] *Too Close for Comfort*, *supra* note 4, at 6-7.

[11] *Digital Weeds*, *supra* note 4, at 5.



The Attorney General's legitimate grounds for investigation are hardly limited to illegal drug sales. For example, YouTube is routinely used to distribute other content that is harmful to minors, such as videos regarding "How to Buy Cigarettes When Underage" (over 217,000 views),[12] and "How to Create Fake ID Using Photoshop" (over 53,000 views).[13]

The district court failed to seriously consider these facts in weighing the equities and the public interest. Although it recognized the Attorney General's "strong interest" in investigating suspected wrongdoing, the court stated that its

---

[12] *How to Buy Cigarettes When Underage*, YouTube, http://bit.ly/1BMQJBJ (last visited June 24, 2015).

[13] *How to Create Fake ID Using Photoshop*, YouTube, http://bit.ly/1LCf8d3 (last visited June 24, 2015).

injunction "w[ould] not significantly thwart the Attorney General's ability to investigate and enforce violations of Mississippi's consumer protection laws" because the Attorney General would be free to "conduct an investigation and file an action regarding other matters that are within his jurisdiction." Op. 23-24.

With all due respect to the district court, it is utterly inappropriate for a federal court to set the enforcement priorities for a state law enforcement officer by instructing him to focus on "other matters." Op. 24. It is the responsibility of the Mississippi Attorney General—not a federal district court—to determine which suspected violations of Mississippi's consumer protection laws are worth pursuing. Prohibiting the Attorney General from investigating Google's suspected wrongdoing, and thereby effectively immunizing any such wrongdoing from prosecution, causes a serious injury to the State and to the public even if the Attorney General remains free to investigate other unrelated matters. *Cf. Planned Parenthood*, 734 F.3d at 419 (recognizing "the irreparable harm of denying the public interest in the enforcement of [state] laws").

The district court similarly erred in its cursory analysis of the public interest. Relying on its flawed First Amendment analysis, the court held that the public interest favored promoting "largely-unfettered access to Internet mediums for the purpose of publishing and viewing content and information." Op. 24. But, of course, nothing about a subpoena or an investigation would impair Google's ability to

publish lawful content and information on the Internet. And, as the examples detailed above demonstrate, there are many cases where "largely-unfettered access to [the] Internet" cuts decidedly *against* the public interest—such as when that access is used to advertise illegal sales of prescription drugs to children.

In all events, the district court plainly abused its discretion by failing to even *consider* the countervailing public interest in detecting and punishing unlawful conduct. This Court has repeatedly recognized the public interest in the enforcement of state laws. *See, e.g.*, *Veasey v. Perry*, 769 F.3d 890, 895-96 (5th Cir. 2014); *Planned Parenthood*, 734 F.3d at 419; *Voting for Am. v. Andrade*, 488 F. App'x 890, 903-04 (5th Cir. 2012). But the district court simply ignored that interest, instead applying a *per se* rule that "injunctions protecting First Amendment freedoms are always in the public interest." Op. 24.

Even if Google were likely to succeed on its First Amendment claim—and it is not—that hardly excuses a full analysis of each of the four elements of the preliminary injunction standard. Indeed, in *Winter*, the Supreme Court reaffirmed "the importance of assessing the balance of equities and the public interest in determining whether to grant a preliminary injunction," and faulted the district court for addressing these considerations "in only a cursory fashion." 555 U.S. at 378. At the very least, this Court should vacate the injunction and remand for the district

30

court to apply the preliminary injunction standard in a manner that gives proper consideration to the public interest and the balance of equities.

## CONCLUSION

Google's previous settlement with the Department of Justice should eliminate any serious argument that Google's business model makes it immune from legitimate investigation by law enforcement officials. The Justice Department could not have reached that half-a-billion-dollar settlement if the courts had enjoined the investigation in its infancy out of premature concerns that the investigation would run afoul of federal law and the Constitution. In the end, the settlement and the investigation that produced it vindicated the rule of law and protected the public interest. Google's extraordinary effort to enjoin the Mississippi Attorney General's investigation raises all the problems an effort to enjoin the Justice Department investigation would have raised and one more: the profound federalism problems created by an extraordinary request to have a federal court enjoin a state proceeding, in clear violation of the *Younger* doctrine.

The preliminary injunction entered below is the wrong remedy in the wrong court at the wrong time. Google will enjoy ample opportunities to protect its rights if the Attorney General's investigation is allowed to progress. But if that investigation is halted before it begins in earnest, there will be no later opportunity to vindicate the public interest in seeing criminal misconduct investigated and

stopped. Because Google has no federal right to block a state investigation into its suspected wrongdoing, and because in any case the other relevant factors weigh unmistakably against a preliminary injunction, the decision below cannot stand.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
VIET D. DINH
JEFFREY M. HARRIS
C. HARKER RHODES IV
BANCROFT PLLC
500 New Jersey Avenue NW
7th Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Amici Curiae*

June 29, 2015

32

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that the textual portion of the foregoing brief (exclusive of the disclosure statement, tables of contents and authorities, and certificates of service and compliance, but including footnotes) contains 6,994 words as determined by the word counting feature of Microsoft Word 2013.

Pursuant to Circuit Rule 28A(h), I also hereby certify that the electronic file of this Brief has been submitted to the Clerk via the Court's CM/ECF system.  The file has been scanned for viruses and is virus-free.

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement